## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| NOVA DESIGN BUILD, INC., and ANNEX BUILDERS LLC, | ) ) | |
|         Plaintiffs, | ) | |
|         v. | ) | Civil Action No.  08 C 2855 |
| | ) | |
| GRACE HOTELS, LLC, MUKESH BHEDA LYONS DESIGN GROUP, INC., ADAM LYONS, ROBERT WALZ, CAPITAL CONSTRUCTION LLC, and JEFF SCHMITZ, | ) ) ) ) ) | Hon. Samuel Der-Yeghiyan |
| | ) | |
|         Defendants. | ) | |

## PLAINTIFFS' RESPONSE TO GRACE HOTELS *ET AL'S*  MOTION TO DISMISS

Nova Design Build, Inc., ("Nova"), and Annex Builders LLC ("Annex"), by their attorneys, respond as follows to the Motion to Dismiss filed by defendants Grace Hotels, LLC ("Grace"), Mukesh Bheda ("Bheda"), Robert Walz ("Walz"), Capital Construction LLC ("Capital"), and Jeff Schmitz ("Schmitz")(collectively, the "Defendants").

## INTRODUCTION

Although they have styled their pleading as a Rule 12(b)(6) Motion to Dismiss (the "Motion"), the Motion could not be more misguided or more blatantly ignore the well settled purpose of Rule 12(b)(6).  Stripped to the core, the Motion is nothing more than a debate of the factual allegations (on a conspicuously incomplete record) rather than a proper challenge to the legal sufficiency of the Complaint.  For good measure, the Defendants' motion strays well beyond the face of the Complaint and purports to support its arguments with *twenty* exhibits, including four signed (but un-notarized) declarations.  Simply stated, the Court need not wade through the morass of extrinsic materials that the Defendants have attempted to interject (selectively) to support their skewed version of the facts. The Motion should be stricken or denied summarily.

Apart from this pervasive fatal procedural flaw, however, the Motion is also wholly without legal merit, as it spins straw-man arguments and miscasts Plaintiffs' claims, cites to inapposite

authority, and ignores other well settled principles of law with regularity. As set forth in greater detail below, Plaintiffs have alleged facts to support each and every count of their Complaint. The Motion should be denied.

## THE WELL-PLED FACTS

The following facts must be accepted as true:

*The Parties and their Written Agreement*

1.     Nova is a licensed architect, offering a full range of architectural design services, and construction supervision and consulting services. Its affiliate, Annex, offers construction services to Nova's clients. By coordinating their respective design and construction services, Nova and Annex realize various efficiencies enabling them to offer a turn-key design and construction package at reduced costs and at an accelerated schedule, thereby giving Nova and Annex a competitive advantage in bidding on most design-build projects. Complaint at ¶¶ 1, 2, 12-14.

2.     In or about March 2006, Grace contacted Nova to solicit a proposal for the design and construction of a Holiday Inn Express hotel on a small lot in Waukegan, Illinois. Grace, purporting to be a franchisee of InterContinental Hotels Group (IHG), provided Nova with a generic prototype design that set forth a footprint and basic specifications for the three story structure. In response to Grace's solicitation, Nova submitted a proposal for the two phases of the project: The first phase contemplated preparation of "scope" architectural, structural, electrical, HVAC and plumbing drawings for $50,000 (plus expenses); and the second phase contemplated that Grace would enter into an AIA form construction contract with Annex upon mutually agreeable terms within thirty days thereafter. *Id* at ¶¶ 12-15.

3.     There is a significant distinction between "scope" drawings (generally used solely in the permitting process, and thus less detailed and less expensive) and "design development" (generally used to actually solicit construction bids, and thus more detailed and more expensive). By coordinating with Nova (the designer), however, Annex (as builder), can use Nova's "scope

drawings" to prepare a construction bid, where other builders would need the more expensive drawings to prepare their bids. This is, again, a way that Nova and Annex realize efficiency that could yield savings for their clients, and give them a competitive advantage. *Id* at ¶ 18.

4.      After extensive discussions with Grace, Nova agreed to provide full "design development" drawings at the cost of the "scope" drawings that Grace could use to solicit construction bids from builders other than Annex. Obviously, if Annex was awarded the construction project, its fees would more than offset the reduced fee that Nova received. Alternatively, if Annex was not awarded the construction contract, Grace agreed to pay Nova an additional $15,000 fee. This Agreement was reduced to writing and signed by the Parties (the "Agreement"). It is attached to the Complaint as Exhibit A. As described above, Annex was a third party beneficiary of the Agreement, which created a financial incentive to select Annex as the builder. *Id* at ¶¶ 19-22.

5.      The Agreement contemplated that the permit drawings would be completed within ninety days from the Agreement's execution. (*See* Agreement at ¶ 5). The Agreement also expressly described the scope of the work that was included for the $50,000 fee, and other work that was *not included* as part of the fee. (*See* Agreement at ¶¶ 2, 3). Among the work that the parties agreed would not be included as part of the $50,000 fee, was "any revisions not initiated by Nova Design Build, Inc., after approval to start design development drawings." (*See* Agreement at ¶ 3G). Such additional work would be billed to Grace at a rate of $70/hour. Finally, and certainly most significantly for this case, the Agreement contemplated that Grace could use Nova's drawings for bidding, permitting and construction purposes, but the parties expressly agreed that the design and drawings would remain Nova's property and could not be duplicated in any form or fashion without Nova's written approval. (*See* Agreement at ¶¶ 9, 12). *See also* Complaint at ¶¶ 23-26.

   *Grace's Request for Additional Work*

6.      From the outset, Grace made numerous requests of Nova to perform additional work beyond the scope of work included as part of the $50,000 fee. This included numerous meetings with

3

civil engineers, city officials, other consultants and principals of Grace, who requested material deviations from basic specifications set forth in the prototype and required extensive additional work. Nova precisely tracked its time spent performing such additional work. Nova completed the necessary drawings detailing the architectural, structural, mechanical, plumbing, electrical and fire protection design and features of the building in a timely fashion. Complaint at ¶¶ 27-29.

7.    On each and every drawing, the following prominently appears:

**© 2006 NOVA DESIGN BUILD, INC.  ALL RIGHTS RESERVED.**
**NO PART OF THIS DRAWING MAY BE REPRODUCED IN ANY WAY WITHOUT**
**THE PRIOR WRITTEN PERMISSION OF NOVA DESIGN BUILD, INC.**

The drawings were issued on or about June 19, 2006 for submission to the City of Waukegan for permitting.  Nova promptly revised the drawings to conform to the City's minor comments, and submitted the revised drawings to the City on or about August 22, 2006.  Grace was not charged for these revisions.  Grace, however, requested Nova's assistance with efforts to persuade its franchisor to approve the many deviations and variances that Grace had requested from the prototype.  This was additional work, for which Nova was entitled to an additional hourly fee.  *Id.* at ¶¶ 32, 36-37.

*Grace's Refusal to Pay Amounts Due and Owing to Nova*

8.    On or about September 5, 2006, Annex submitted a bid to build the hotel that Nova had designed, but a week later Grace advised Nova that it would seek competitive bids.  Copies of Nova's copyrighted drawings were furnished to ten other builders for the purpose of soliciting construction bids. Despite previous assurances from Grace, Annex was never afforded and opportunity to meet lower bids.  Per the terms of the Agreement, the failure of the parties' to reach a mutually agreeable construction contract within thirty days of the completion of permit drawings released Nova of any further architectural or engineering responsibilities except for the revision of drawings as required by the City.  *Id.* at ¶¶ 38-39.  *See also* Agreement, Part II.

4

8.    Pursuant to the terms of the Agreement, Nova submitted invoices to Grace for the additional work performed on its behalf, billed at the rate of $70/hr, and for reimbursable expenses. Grace, however, failed to pay the invoices and became unresponsive to calls from Nova and Annex inquiring about the status of payment and/or the project.  Accordingly, Nova advised Grace that it would suspend further service unless and until the outstanding invoices (which at the time, totaled $13,643.50), and the additional $15,000 fee was paid.  Notwithstanding the express terms of the Agreement, Grace threatened to withhold all future payments, and to replace Nova unless it agreed to forego a substantial portion of the amounts that it was owed.  Nova was ultimately forced to accept $18,000 of the more than $28,000 to which it was entitled.  Complaint at ¶¶ 40-42.

*The Unlawful Duplication and Use of Nova's Design and Drawings*

9.    On or about October 16, 2006, Nova promptly responded to the City's final comments on its drawings, and the City issued a construction permit based upon Nova's design and drawings. At or around that this time, Capital submitted its bid for the construction of the hotel (which was competitively comparable to the bid that was submitted by Annex).  Grace demanded, however, that the costs be reduced, and to do so, worked in concert with Capital to modify Nova's existing structural designs as necessary to reduce costs.   To further cut corners and avoid expenses, Grace and Capital arranged to have Capital provide the requisite drawings (instead of Nova) at a dramatically reduced cost, and for Capital to be awarded the construction contract.  *Id. at ¶¶ 43-49.*

10.    The only practical way to do so, however, was to misappropriate Nova's designs and drawings, without regard to terms of the Agreement and the clear Notice of Copyright and accompanying restrictive language on the drawings.  Lyons Design and Walz were each given a set of Nova's copyrighted drawings, and unlawfully used the drawings to prepare a modified set of certain drawings that were submitted to the City to supplement Nova's drawings.  These infringing drawings are virtually identical in overall form, arrangement, layout, description and composition of spaces and elements of unique or creative design, as Nova's copyrighted drawings. Nova was neither advised of

nor consented to the use or copying of its designs of drawings by Lyons Design or Walz. *Id.* at ¶¶ 50-56, 63-65.

11.     By submitting these nearly identical drawings to supplement the Nova drawings on file with the City (and which were signed by a licensed Structural Engineer), the Defendants apparently mislead the City as to attribution of the drawings as evidenced by the fact that the critical engineering and foundation design changes despite the fact that they were not signed or sealed by a Structural Engineer licensed in the state of Illinois. *Id.* at ¶ 54.

12.     Only through the wrongful conduct described above was Capital able to underbid Annex and was awarded the construction contract by Grace, and each Defendant substantially profited from the unlawful infringement described herein.   Plaintiffs have been wrongfully depriving of additional fees for professional services that were and are necessary and incident to the design and construction project. *Id.* at ¶¶ 57-58, 67-69.

13.     Plaintiffs commenced this action alleging copyright infringement by all Defendants (Count I); seeking preliminary and permanent injunctive relief to enjoin further infringement (Count II); alleging breach of contract by Grace (Counts III and IV); alleging misappropriation (Count V); alleging violation of the Illinois Uniform Deceptive Trade Practices Act (Count VI); and alleging tortious interference with Nova's contract and Annex's prospective economic advantage (Count VII). The Defendants have moved pursuant to FRCP 12(b)(6) to dismiss each of the referenced Counts.

## THE CONTROLLING LEGAL STANDARD

Defendants bear a weighty burden in seeking dismissal pursuant to Rule 12(b)(6).   It is axiomatic that in order to prevail on such a motion, the Defendants must clearly show that Plaintiffs can prove *no* set of facts that would entitle them to relief.   *See* Fed. R. Civ. P. 12(b)(6); *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) ("[A] complaint should not be dismissed for failure to state a claim unless it appears *beyond doubt* that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." (emphasis added).   Moreover, in considering the Motion, this Court must

accept all of the Complaint's well-pled allegations as true, and draw all reasonable inferences from those allegations in the Plaintiff's favor. *See Jackson v. E.J. Brach Corp.,* 176 F.3d 971, 977 (7th Cir. 1999). A Rule 12(b)(6) Motion that merely disputes factual allegations or purports to raise defenses to the claims must fail. *See, e.g., U.S. v. Northern Trust Co.,* 372 F.3d 886, 888 (7th Cir. 2004) ("A complaint states a claim on which relief may be granted whether or not some defense is potentially available."). As the Seventh Circuit has succinctly noted: "One pleads a 'claim for relief' by briefly describing the events. At this stage the plaintiff receives the benefit of imagination, so long as the hypotheses are consistent with the complaint." *Sanjuan v. American Board of Psychiatry and Neurology, Inc.,* 40 F.3d 247, 251 (7th Cir. 1994).

Finally, because a Rule 12(b)(6) motion merely challenges the legal sufficiency of the alleged facts (which, again, must be accepted as true), it is notably inappropriate for the movant to interject and rely upon new facts and exhibits. In fact, when considering a Rule 12(b)(6) motion to dismiss a complaint, a court "must not look to materials beyond the pleading itself." *Alioto v. Marshall Field's & Co.,* 77 F.3d 934, 936 (7th Cir. 1996). If a court considers any extrinsic materials, then it must convert the motion to one seeking summary judgment. *Id.*[1] Such a conversion requires notice to the Plaintiff and an opportunity to respond accordingly. *Travel All Over The World, Inc., v. Kingdom of Saudi Arabia,* 73 F.3d 1423, 1430 (7th Cir. 1995)("Failure to treat such a motion as one for summary judgment and provide the litigants with notice and an opportunity to respond can constitute reversible error.").

As set forth above, and in greater detail below, Defendants have not even come close to meeting their burden of proving that there are no facts that would entitle the Plaintiff's to prevail on their claims. In fact, as the Motion tenuously rests almost entirely on extrinsic material, it should be summarily denied. If the Court chooses to indulge the Defendants, and convert their Motion into one

---

[1]    It should be noted that summary judgment is generally disfavored in copyright infringement cases. *See Hoehling v. Universal City Studios, Inc.,* 618 F.2d 972, 977 (2d Cir. 1980). This further supports denial, rather than a conversion, of the Motion to Dismiss.

seeking summary judgment, then Defendants should be ordered to file a statement of material facts as to which the Defendants contend there is no genuine dispute as required by Local Rule 56.1 of this District, and Plaintiffs shall respond accordingly.[2]

## THE COMPLAINT CLEARLY STATES A CLAIM FOR COPYRIGHT INFRINGEMENT

Plaintiffs' Complaint plainly and properly states a cause of action for copyright infringement. In order to state a valid claim for copyright infringement, plaintiff need merely show both ownership of a valid copyright, as well as copying of the constituent elements of that work. *See, e.g., Harris Custom Builders, Inc., v. Hoffmeyer,* 92 F.3d 517, 519 (7th Cir. 1996). A certificate of copyright registration is *prima facie* evidence of the copyright's validity, thereby satisfying the first element. *See, e.g., Flick-Reedy Corp., v. Hydro-Line Manufacturing Co.*, 351 F.2d 546, 549 (7th Cir. 1965). And the Complaint alleges (and Defendants do not dispute) that the Defendants flat-out copied the Nova drawings, thereby satisfying the second element. The Motion to dismiss must be denied as to Count I.

Defendant ignores rather than accepts these factual allegations, and litters their Motion with extrinsic facts in a veiled attempt to defeat the presumptively valid copyright. The Court should deny the Motion without even considering the extrinsic allegations, declarations and exhibits.

Apart from the fatal procedural flaw, however, the Defendants' arguments are also legally meritless. Defendants seemingly argues that Nova is somehow contractually prohibited from copyrighting its designs and drawings because they are "derivative" of a copyrighted prototype prepared by InterContinental Hotel Group ("IHG"). *See* Motion at pp 2-3. For good measure, Defendants state (albeit falsely) that Nova concealed the fact that its designs and drawings were based on other copyrighted works, thereby invalidating the copyright. *Id.* at p. 4. These arguments are riddled with gaping flaws.

---

[2]    The Motion, as presented, is wholly void of any cogent statement of facts to which Plaintiff can respond for purposes of identifying the disputed factual issues that would preclude summary judgment. Out of an abundance of caution, Plaintiffs have submitted the affidavit of Himanshu Modi, the principle of the Plaintiffs, to demonstrate some of the genuine factual issues that would preclude summary judgment, but without waiving their right to fully and fairly respond to a Motion for Summary Judgment and Statement of Facts, if the Court decides to covert the flawed Motion to Dismiss into such a Motion.

First, it is perplexing how Defendants could even argue that Nova could be bound by or that its rights could be limited by a contract between IHG and Grace **when Nova is not alleged to be (and is not) a party to the agreement and, in fact, is not alleged (and did not) even know of its existence or terms.**  (*See* Modi Affidavit submitted herewith, at ¶ 9).

Second, Defendants' hubristically proclamation notwithstanding, there is nothing in the Complaint **or** the Motion's improperly submitted extrinsic materials that even remotely suggest that Nova's designs and drawings are derivative, rather than original works.  Defendants seemingly have no idea what "derivate work" actually means.  Purporting to rely on *Shrock v. Learning Curve International, Inc.,* 531 F.Supp. 990 (N.D. Ill. 2008), the Defendants have apparently concluded that *any* subsequent work that is based (to any degree) on a preexisting work is derivative.  In fact, *Shrock* suggests the exact opposite, noting that *in addition to* being "based upon" a preexisting work, a derivative work "must recast, transform or adapt… the preexisting work." *Id.* at 1674 (emphasis added).  In *Shrock,* the "derivative work" was a photograph of a copyrighted toy: the photograph was "based upon" the toy, and "recast it" from a three dimension object to a two dimensional image.  Similarly, in *Picket v. Prince,* 207 F.3d 402, 404-05 (7th Cir. 2000), the preexisting work was a fanciful symbol that was "recast" into a guitar of the same shape.  The element of "recasting" in some form or fashion is completely absent in this case, raising a serious question as to whether the concept of derivative work has any application to a dispute involving competing design drawings.

There is, in fact, a dearth of authority that even applies the concept of "derivative works" to the field of architectural design.  In *Watkins v. Chesapeake Custom Homes, LLC,* 330 F.Supp.2d 563 (D.Md. 2004), however, the court's reasoning makes it abundantly clear that the mere existence of and access to prior works does not mean that everything that follows must be "based upon" the prior work.  Quite the contrary, in determining that the second drawings were "derivative" rather than "original" works,[3] the *Watkins* Court relied upon admissions that the preexisting drawings were used to make the subsequent sketches, that substantial portions of  the preexisting drawings were copied into the sketches, and that "a majority of the elements appearing in the sketch (dimensions, room shapes, etc.) were copied directly from the [preexisting plans.]"  In

---

[3]     The Court in *Watkins* did not apply the same stringent definition used by this Court in *Shrock,* requiring that a derivative work must be "based upon" a preexisting work **and** "must recast, transform or adapt… the preexisting work."

this case, there is no such evidence—in fact, Nova prepared its designs from scratch, nothing was simply copied and the design elements are almost entirely unique and original. There is simply no basis to conclude the contrary, particularly at this stage of the proceedings.

Indeed, it is curious that the Defendants would even raise the question without even bothering to attach *any* of the drawings at issue so that the Court could see for itself that Nova's designs and drawings are unique and original. This was no oversight. Indeed, by merely attaching a "list" of prototype drawings, Defendants were seemingly hoping to obscure the fact that the prototype is generic, expressly disclaiming suitability for any particular site or local conditions. *See* Defs' Ex. G-002. Or more importantly, that the prototype simply contains basic floor plans (which Nova did not use) and does not include any architectural, structural, plumbing or electrical designs, merely "narratives" about the same. *Id.* Defendants' suggestion that by attaching this sparse and misleading exhibit they have "thoroughly rebutted" the presumption that Nova's copyright is valid is almost laughable.[4]

Finally, Defendants' argument that the validity of Nova's copyright has been rebutted because Nova allegedly concealed form the Copyright Office the fact that its designs and drawings were allegedly "based on" other copyrighted works is both factually and legally wrong. Again, the drawings were unique and original, and not "based upon" any prior works. Indeed, as Modi's Affidavit makes clear, IHG initially rejected the designs because they did *not* conform to prototype specifications, and then eventually approved them on the condition that they include a few signature features. This hardly makes them "based upon" the prototype. But so it is clear, the limited incorporation of prototype features into the Nova designs (at the insistence of IHG) was absolutely disclosed. The application plainly states: "Few elements [were] compiled from franchise motel prototype design." *See* Modi Affidavit at ¶ 16. In any case, even if there had been such a failure, it would not, alone, invalidate Nova's copyright. *See Balsamo/Olson Group, Inc., v. Bradley Limited Partnership,* 966 F.Supp. 757, 762 (N.D.Ill. 1996)(failure to inform Copyright Office of use

---

[4]     Even assuming, for sake of argument, that Nova's work could be deemed "derivative," there is evidence that IHG consented to Nova's assertion of a copyright over the derivative works. Indeed, by reviewing and approving drawings which bore Nova's asserted copyright, IHG—which never objected or protested—itself consented, and consented through its franchisee—which also never consented or protested. *See Gracen v. Bradford Exchange,* 698 F.2d 300, 303 (7th Cir. 1983)(question of fact as to whether licensee had apparent authority to grant sublicense to create derivative work). *See also* Modi Affidavit at ¶ 9.

of minor preexisting details from previous work did not render copyright invalid). In short, the

Motion is wholly insufficient as the copyright infringement counts (I and II)[5] and must be denied.[6]

## THE COMPLAINT CLEARLY STATES A CLAIM FOR MISAPPRIATION

The Complaint plainly and properly states a cause of action for misappropriation under Illinois

law. To state such a tort claim, a plaintiff must merely allege that it created a product through the

investment of extensive time, labor, skill or money, that it was used by another in competition with

the plaintiff by someone who made no such investment (or who received "a free ride") and caused

commercial damage to the plaintiff. *See McNabb Bennett & Associates, Inc.,v. Terp Meyers*

*Architects, et al.,* 1987 WL 7817 (N.D.Ill. 1987)(claim arising from unlawful use of design drawings).

In moving to dismiss this Count, the Defendants simply rehash their "derivative works"

defense to the copyright infringement claims, and argue that Plaintiffs cannot "claim ownership of

their derivative works." First, apart from the fact that Nova's designs are not derivative works as

discussed above, the argument demonstrates a fundamental lack of understanding of the nature of the

claim. As the *McNabb Court* reasoned: "misappropriation focuses on the question of whether the

defendant actually used, not copied, another's property and thereby profited from the plaintiff's

expenditure of time, labor and expense. Consequently, a claim premised on the wrongful use of the

drawings, as opposed to its copying, may be outside the scope of the Copyright Act." 1987 WL

7817*6. As the Complaint makes clear, Nova invested significant time, labor and expense in

preparing their drawings, which Defendants then wrongfully used to profit at Nova's expense. As the

Modi Affidavit makes clear, the Defendants obtained a "free ride" by using Nova's drawings, *not* by

---

[5]    Count II seeks injunctive relief to prevent ongoing use of the infringing designs. In an afterthought argument relegated to its conclusion, Defendants' cryptically conclude that injunctive relief "would harm significant interest of non-parties," citing *Balsamo/Olson Group, Inc., v. Bradley Limited Partnership,* 966 F.Supp. 757, 762 (N.D.Ill. 1996) in which the court declined to enjoin the construction of low income senior housing because of the hardship it would pose for seniors. No such concerns are presented by this case. The only persons who stand to lose in this case are those who are guilty of blatant piracy.

[6]    As a fall back, Defendants argue claim that the infringement was licensed by implication., and incorporate by reference the Motion to Dismiss filed by the Lyons Defendants which argues the same. Plaintiffs incorporate, by reference, their Response to the Lyons Defendants' Motion to Dismiss, which addresses this baseless argument in detail.

using IHG's drawings.  Modi Affidavit at ¶ 17.  The claim is indeed well pled and the Motion as it relates to Count V must be denied.

## THE COMPLAINT CLEARLY STATES A CLAIM FOR VIOLATION OF THE ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT

The Complaint plainly and properly states a cause of action for violation of the Illinois Uniform Deceptive Trade Practices Act (the "UDTPA").   To state such a claim, a plaintiff must merely allege deceptive conduct that cause or creates a likelihood of confusion as to either the source, sponsorship or approval of goods or services, or the affiliation, connection or association with another.  *See* 815 ILCS 510/2(2) and (3). *See also Stephen & Hayes Construction, Inc. v. Meadowbrook Homes, Inc.,* 988 F.Supp. 1194, 1198 (N.D.Ill. 1998).   Defendants do not allege that the Complaint fails to allege facts sufficient to state such a claim but argues that this claim is somehow "not countenanced under trademark, unfair competition, deceptive trade practices and similar laws."  *See* Motion at p. 5.  Not surprisingly, Defendants offer authority to support this bizarre statement.  Because they cannot.

So it is clear, claims under the UDTPA are not preempted by the Copyright Act.  *Id.* at 1199 (though claims are similar, the element of likelihood of confusion qualitatively changes the nature of UDTPA from claims under Copyright Act).  Any suggestion to the contrary by Defendants is simply wrong.  Nor is this a "Lanham-type" claim (whatever that means). *See* Motion at p. 5.  Defendants' reliance on "*Daystar [sic]*" is wholly misplaced.  The Court in *Dastar Corp. v. Twentieth Century Fox Film Corp.,* 539 U.S. 23 (2003) simply held that "the Lanham Act does not prevent the unaccredited copying of an *uncopyrighted work.*" 539 U.S. at 23-24 (emphasis added).  It has no bearing on this case, where the Defendants have copied copyrighted drawings and passed them off as their own.  To the extent the Defendants are arguing that *Dastar* implicitly preempts such a UDTPA claim, they are, once again, wrong.  Indeed, *Weidner v. Carroll¸* 2007 WL 2893637 (S.D.Ill. 2007), a

case on which Defendants purport to rely, reaffirms that there is no such preemption.  2007 WL 2893637*5.

In the end, stripped of these baseless legal arguments, the Motion simply interjects new allegations and exhibits to argue that the City of Waukegan "was not confused."  The Court should reject the argument out of hand, particularly where there is ample contrary evidence of actual confusion that can be inferred from the Complaint, and further detailed in Modi's Affidavit (*See* Affidavit at ¶¶ 18-19).

## THE COMPLAINT CLEARLY STATES CLAIMS FOR BREACH OF CONTRACT

The Complaint plainly and properly states a cause of action for breaches of the parties Agreement, both for Grace's failure to pay the full amount due and owing to Nova, and for Grace's copying Nova's drawings in clear violation of the Agreement. The Motion again simply interjects extrinsic evidence and argues that an "accord and satisfaction" defeats the contract claims.  *See* Motion at p. 7.    The argument is misplaced, and misguided.  First, "accord and satisfaction" is an affirmative defense, and thus cannot form the basis for a 12(b)(6) dismissal. *See In re Estate Of Lena Castro,* 289 Ill.App.3d 1071, 1077, 683 N.E.2d 1255, 12259 (2d Dist. 1997).   Moreover, in order for an accord and satisfaction to operate as a release of a contractual obligation, it is axiomatic that there must be a "bona fide dispute."  *Id.*   In this case, the Complaint has plainly alleged facts that, accepted as true, preclude any such conclusion. In the absence of a *bone fide* dispute, there could not be an enforceable modification of the Agreement without consideration to Nova (which is entirely lacking in this case). *See Doyle v. Holy Cross Hospital*, 186 Ill.2d 104, 112, 708 N.E.2d 1140, 1144-45 (Ill. 1999).   *See also  Century 21 Real Estate Corp. v. CLTM Associates, Ltd.,* 2003 WL 288951 (N.D. Ill. 2003)(questions of material fact regarding affirmative defense of failure of consideration preclude summary judgment).

Finally, it is entirely unclear from the sparse argument in the Motion how a waiver of an invoice somehow can be transformed into *carte blanche* to copy Nova's copyrighted documents. The Motion must be denied as to the breach of contract claims (III and IV).

**THE COMPLAINT CLEARLY STATES
A CLAIM FOR TORTIOUS INTERFERENCE**

Finally, the Complaint plainly and properly states a cause of action for tortuous interference with both the Agreement as well as Annex's prospective economic advantage. The elements of the tort include (1) interference with a contract or reasonable expectation of entering a contract or valid business relationship; (2) the defendants' knowledge of the plaintiff's contract or expectancy; (3) purposeful or intentional interference by the defendants that causes another to breach the contract or prevent the legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from such interference. *See Miller v. Lockport Realty Group, Inc.,* 377 Ill.App.3d 369, 374, 878 N.E.2d 171, 176 (1st Dist. 2007). Once again, the Motion does not challenge the sufficiency of the allegations, but rather instead, interjects extrinsic evidence and argues that Plaintiffs "renounced any interest in the construction contract." *See* Motion at p. 8. The Motion should be denied.

Indeed, for the same reason that the coerced release cannot operate as an accord and satisfaction, the back of the envelope alleged "waiver" does not relieve the Defendants from liability for their tortuous conduct. It is similarly unclear how any such waiver could be spun into a waiver of copyright rights. The Motion must be denied.[7]

---

[4]     The Defendants' request for award of attorneys fees, predicated on a presumption that they would prevail on the merits of their Motion, should similarly and accordingly be rejected.

## CONCLUSION

For the reasons set forth herein, the Motion must be denied, and this Court should grant such

additional relief to Plaintiffs as it deems appropriate.

Respectfully submitted,

NOVA DESIGN BUILD, INC. and ANNEX
BUILDERS LLC,

By:  /s/ George J. Spathis
One of their Attorneys

George J. Spathis (No. 6204509)
S. Jared Raab (No. 6294632)
Rebecca Hanson (No. 6280296)
Shaw Gussis Fishman Glantz Wolfson & Towbin LLC
321 N. Clark, Suite 800
Chicago, Illinois  60610
(312) 541-0151

## **CERTIFICATE OF SERVICE**

George J. Spathis, an attorney, certifies that service of the above and foregoing pleading was accomplished through the Electronic Notice for Registrants on the attached CM/ECF service list, as well as by U. S. Mail delivery upon the service list, as indicated, on or before the 31st day of July, 2008.  Copies of documents required to be served by Fed. R. Civ. P. 5(a) have been served.

### **CM/ECF Service List**

The following is the list of attorneys who are currently on the list to receive e-mail notices for this case:

Warner Sabo, Esq.
wsabo@sabozahn.com

Shawn E. Goodman, Esq.
sgoodman@sabozahn.com

Daniel L. Kegan, Esq.
Daniel@keganlaw.com


_____*/s/ George J. Spathis*_____

STATE OF ILLINOIS     )
                             )    SS:

COUNTY OF COOK     )

## AFFIDAVIT OF HIMANSHU J. MODI

Himanshu J. Modi, on oath, deposes and states as follows:

1.    I am over the age of twenty-one, and competent to testify to the matters set forth herein based upon my own personal knowledge. I am the principle shareholder and chief executive officer of Nova Design Build, Inc ("Nova").

2.    I have personally designed three Holiday Inn Express hotels besides the hotel that is being constructed on Lakehurst Road in Waukegan, Illinois (the "Lakehurst Holiday Inn Express") that is the subject of Nova's litigation against Grace Hotels, LLC ("Grace Hotels") and others. In each case, I was provided by the franchisee with what I have described as a Holiday Inn Express prototype.

3.    I am aware that International Hotels Group ("IHG") has asserted a copyright on its various prototype drawings. The prototype drawings are not, however, complete or even near-complete design drawings from which any structure could actually be built. Most significantly, the prototype drawings do not include critical engineering (structural, mechanical, electrical or plumbing) designs that are necessary to get local plans approved and permits issued. Moreover, the prototype architectural design is generic, in that it is not for any specified location, and thus completely fails to take into account site limitations, climate, physical conditions, geometry, boundary dimensions, and local zoning and building code requirements.

4.    The prototype architectural drawings merely provide a basic generic footprint and certain signature features for Holiday Inn Express. The franchisee must rely on design professionals to design a structure that meets the minimum standards and prototype specifications and that can actually be built on a particular site.

5.    Each of the three Holiday Inn Express hotels that I designed (other than the Lakehurst Holiday Inn Express) deviate substantially from the IHG prototype architectural drawings that were presented to me. In connection with each, I submitted multiple draft design drawings to the franchisee (my client) and the franchisor (IHG) for comment and approval. On each and every drawing submitted to IHG, Nova clearly and conspicuously asserted a copyright, to which IHG never protested, objected or posited any challenge.

6.    With respect to the Lakehurst Holiday Inn Express project, the selected prototype design could not be utilized for the particular site. The hotel had to be reconfigured substantially to be built on the site at Lakehurst Road. Nova designed the

structure from scratch (IHG did not provide a revised prototype suitable for the specific site or for its franchisee's specific needs). Moreover, the franchisee requested certain changes to the interior entry, which required Nova to substantially reconfigure the entire first floor. In connection with the design project, Nova prepared and presented multiple architectural and engineering drawings that reflected Nova's unique and original design for a hotel that would fit within a smaller footprint (than that contemplated by the prototype), but offer increased capacity (than that contemplated by the prototype). Each of Nova's design drawings asserted Nova's copyright and ownership of the drawings.

7. Nova's copyrighted architectural and engineering design drawings were submitted to IHG (on at least three occasions), and IHG never protested, objected or posited any challenge to Nova's assertion of a copyright on its drawings.

8. IHG tacitly recognized the unique nature and originality of Nova's architectural design, and in fact, summarily rejected the design originally because it so clearly deviated for the specifications of the prototype. As a result, I spent a great deal of time promoting the superior features of Nova's unique design to IHG on behalf of my client. In the end, IHG approved Nova's unique design with limited exception, and merely required a few threshold design features from the prototype be incorporated into Nova's design.

9. IHG's written approval of Nova's original designs and Nova's copyrighted drawings is attached hereto (see fax from Kevin Woodward dated 1/5/07). So it is clear, I communicated regularly with Kevin Woodward of IHG regarding the project. I never communicated with Franklin Moore (who purports to have executed a declaration dated April 9, 2008) on this project. Mr. Moore is incorrect in suggesting that IHG did not know of and consent to Nova's assertion of a copyright as to Nova's drawings. Nova was not a party to any franchise agreement between IHG and Grace Hotels, and was not advised of or aware of its terms.

10. Nova's engineering (structural, mechanical, electrical or plumbing) designs and drawings for the Lakehurst Holiday Inn Express are entirely unique and original. There were, in fact, no engineering designs or drawings provided or included with the prototype. All of Nova's engineering designs and drawings were prepared entirely from scratch.

11. Similarly, Nova's architectural designs and drawings for the Lakehurst Holiday Inn Express project are unique and original. They are not based on the limited prototype drawings that I reviewed. In fact, although I received the prototype architectural drawings in an AutoCad file format (AutoCad is the leading software program used to generate and modify architectural and design drawings), Nova's design was so dramatically different from the prototype that the AutoCAD file was of almost no utility, and thus I designed the floor plan from scratch.

12. The unique and original nature of Nova's design would be apparent to both the casual observer and (even more so) to architectural professionals. Most notably,

the footprint, shape, height, dimensions, area and guestroom count of the Nova design differ greatly from the prototype. The prototype contemplates a three story hotel, with a 17,500 sq/ft footprint to accommodate seventy-nine guests. Nova designed a four story structure with a much smaller footprint (15,806 sq/ft) yet could accommodate more ninety-six guests.

13.    The unique and original nature of Nova's architectural design is even more pronounced in common areas of the hotel. Of the more than 100 differences in the first floor common area alone, the most notable include: Nova's design features a entrance and lobby that is twice is wide and twice as high as the entry in the prototype; Nova's design features an "L shaped" wrap-around front desk for improved access and visibility; Nova's design relegates far fewer guest rooms to the main floor than the prototype; Nova's design features an indoor pool located within the building (without expanding the small footprint), where as the prototype which contemplated a pool atrium in the rear of the building as part of the parking lot (and which would not have worked for the site); and Nova's design features four times the meeting room capacity than the prototype, with flexible partitions to accommodate various sized groups.

14.    The guests rooms in Nova's design also vary greatly from the prototype in variety, size, location and layout. Nova's design features two-room suites and Jacuzzi suites, neither of which exists in the prototype. Nova's design eschews the prototype's uniform door clusters for the guest rooms, and instead features a unique layout that staggers the entry of doors to promote privacy and reduce noise. Nova's design also offers an entirely different, more sophisticated bathroom layout than the prototype, and features a separate closet and pantry. By contrast, the prototype lacks any pantry and requires guests to brew coffee in their bathroom.

15.    Simply stated, Nova designed a hotel that was far more sophisticated, aesthetic and comfortable for guests than the prototype contemplates.

16.    I have carefully compared the IHG prototype architectural design to Nova's architectural design and determined that approximately 95 % of Nova's design is unique and original. The remaining 5% represents the few signature features that IHG insisted be added to Nova's design—the front exterior canopy, the placement of the great room, the presence of a back wall behind the front desk and the general appearance of the elevator area-- and for which Nova did not seek and does not assert a copyright. Indeed, in preparing my copyright application (also attached), I expressly noted that these "Few elements [were] compiled from franchise motel prototype design."

17.    I have also reviewed the infringing drawings prepared by the Lyons Design firm and by Robert Walz. These infringing drawings are virtual copies of Nova's drawings, not the prototype drawings.

18.    These Defendants' infringing drawings submitted to the City include modified designs and drawings regarding the foundation and framing of the hotel from the use of metal studs, joists and trusses as contemplated in Nova's design previously

submitted to the City, to the use of inferior wooden studs, wooden joists and wooden trusses. Similarly, the infringing drawings included structural drawings for the hotel that modified the sizing of the structural steel columns and structural steel beams from the sizes contemplated in Nova's engineering design. Incredibly, none of these drawings were not stamped, signed or sealed by a Structural Engineer that is licensed and registered in Illinois. More incredibly, however, these drawings were approved by the City of Waukegan. Any such *knowing* approval of these critical drawings without the requisite stamp, signature or seal of a Structural engineer that is licensed and registered in would be tantamount to a total disregard of Illinois law and controlling ordinances that govern safe construction practices and public safety.

19.    I learned about the infringing drawings only after the construction had begun. It was only thereafter, that I advised the City of Waukegan that Nova was withdrawing from the project. The City's confusion as to my role, however, persists as Nova continues to receive communications *mandating* that it participate in engineering inspections (see attached letter dated 7/29/08).


AFFIANT SAYETH FURTHER NOT.


_Himanshu J. Modi_
HIMANSHU J. MODI


Subscribed and Sworn before me
on this 31st day of July, 2008.


_Dimitrova_
Notary Public


OFFICIAL SEAL
S DIMITROVA
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:10/06/09

# <u>IHG'S 1/5/07 APPROVAL OF NOVA'S COPYRIGHTED DESIGN DRAWINGS</u>

## (See Affidavit ¶ 9)

01/05/2007  12:59    7706042476         PIP DEPT                                    PAGE  01/07

 InterContinental.
H O T E L S   G R O U P

InterContinental Hotels Group
Three Ravinia Drive
Suite 100
Atlanta, GA 30346-2149
www.ichotelsgroup.com

# DESIGN & PLAN REVIEW COMMENTS

| | |
|---|---|
| **Date:** | January 5, 2007 |
| **To:** | Mukesh Bheda<br>3223 Border Road<br>Geneva, IL  60134<br><br>Ph:  630-779-5682<br>Fax: 630-208-9566<br>Email: | Himanshu Modi<br>Nova Capitol Design Build, LLC<br><br><br>Ph: 847-564-1772<br>Fax: 847-564-1473<br>Email: novadbuild@yahoo.com |
| **From:** | Kevin R. Woodard (ASID)<br>InterContinental Hotels Group PLC<br>Three Ravinia Drive<br>Suite 100<br>Atlanta, GA  30346-2149<br><br>phone:  (770) 604-2413<br>fax:      (770) 604-2476<br>e-mail:  kevin.woodard@ichotelsgroup.com | |
| **Project:** | New development of a Holiday Inn Express Hotel & Suites (HEXS) in Waukegen, IL<br><br>Location # 6679 | |
| **Subject:** | Review of the following design submittals:<br><br>• Revised full set of construction drawings – received 11/22/06<br>• Revised 2nd and 3rd floor plans, guest unit plans and written response to the 8/3/06 review – received 12/11/06 | |
| **Copies To:** | Gil Hardwick / Manager of Design Review. via e-mail<br>Cinja Heis / Property Improvement Consultant via e-mail<br>Jennifer Melton / Regional Franchise Specialist via e-mail<br>Marta Bergstrom / NHOP Manager via fax<br>Mukesh Bheda / Franchisee via US mail and fax<br>Himanshu Modi (Nova Capitol Design Build, LLC) / via fax<br>Project File/DM | |

        

Six Continents Hotels, Inc.
A Member of the InterContinental Hotels Group

| I.  PROJECT STATUS: | **Design Review Status:** |
|---|---|
| | **Conditionally Approved:** The submittals defined on the cover page of this review are approved upon compliance with the conditions listed throughout this design review document. Exceptions to this approval are: |
| | ▪ IHG does not approve start of construction at this time. The condition requiring a smoke barrier for the 2nd floor corridor must be met prior to ground break. |
| | Submit revised drawings as needed to show your proposed solutions to the conditions noted throughout today's design review. We do not need to see another complete set of construction drawings unless the overall hotel design changes from that reviewed today. Submit only those drawings needed to clarify or convey your proposed solutions. It is very important that you include a written response to each condition with your follow-up so as to expedite final approval of the hotel design/construction drawings. Refer to the end of this review for full listing of remaining design submittals that will require IHG design approval. |
| | **Franchise License/Application Status:** |
| | Any approval issued by this design review document (conditional or otherwise) applies to the design of the hotel only, and does not affect the status of your application or License Agreement (as the case may be) or any requirements under the License Agreement. Contact InterContinental Hotels Group (IHG) Franchise Licensing Department and/or your franchise sales representative for inquiries regarding the status of your application or license. |

| II. GOVERNING CRITERIA | **Standards & Codes** |
|---|---|
| Express Standards Manual pages 65, 66 & 68. | This Express brand hotel is subject to the requirements of the current Holiday Inn Express Standards Manual (effective date June 6, 2005), the Americans with Disabilities Act (ADA) and all applicable building codes and ordinances. In the event of discrepancies, the most stringent requirements shall take precedence. Any deviations from Brand Standards that have not been explicitly identified in writing as part of your design submittal are not approved. |
| | **New Construction** |
| | Thank you for choosing to base your hotel design on that of the Center Pavilion Express prototype. We are confident that this decision will enhance the value of your development. To maintain consistent representation of prototypical characteristics, be advised that signature features of the prototype design may not be altered beyond certain limits. These limits (as applicable to your design) are outlined in detail in the following design review. |
| | **Brand Hallmarks** |
| | Brand Hallmarks, as listed on pages 11 – 25 of the current Express Standards Manual are mandated for all Express brand hotels. |

01/05/2007 12:59    7706042476    PIP DEPT    PAGE 03/07

| III. FRANCHISEE RESPONSIBILITIES | The franchisee (or the franchisee's representative) is responsible for the following: |
|---|---|
| | 1. The hotel design and construction must be in full compliance with the governing criteria listed in part II above. |
| | 2. The franchisee (or the franchisee's representative) is responsible for ensuring that the terms of this design review document are implemented into the construction documents, and ultimately into the construction of the project. |
| | 3. IHG requires the franchisee to arrange for licensed architects, engineers, interior designers or other qualified professionals to produce design proposals for all new construction or renovation work. Design proposals must be submitted to IHG Design Review Department for evaluation and approval before implementation into the construction of the hotel. Refer to the "Design Proposal & Review Process" listed on page 70 through 71 of the Express Standards Manual for the full terms of the design proposal and review process. Failure to meet these terms is grounds for issuance of license default, and may result in change orders, re-permitting and opening delays. |
| | 4. Revisions, additions or alterations of any kind made to documents previously reviewed by InterContinental Hotels Group must be submitted to IHG Design Review Department for reevaluation. |

## IV GUEST UNIT COUNT AND DISTRIBUTION NOTED DURING REVIEW

| Standard Unit Type | (♿) Wheelchair Access + (𝒽) Hearing Impaired Access Unit Type. | ( 𝒽 ) Hearing Impaired Access Unit Type | Totals |
|---|---|---|---|
| K = 9 | K ♿ + 𝒽 = 1<br>K ♿ = 3 | K 𝒽 = 1 | 14 |
| | | | 6 |
| K_SPA = 6 | | | |
| Q/Q = 49 | Q/Q ♿ + 𝒽 = 0 | Q/Q 𝒽 = 3 | 52 |
| HEXS Suite = 23 | HEXS Suite ♿ = 1 | HEXS Suite 𝒽 = 0 | 24 |
| | | Actual Total Units = | 96 note 1 |
| Licensed Units = 100 note 1 | | | |

1. The Legal Guest Unit Count shall be as listed on the license agreement. Any deviation from the licensed unit count is subject to InterContinental Hotels Group approval or denial. Please contact Jennifer Melton (770-604-2032) of IHG Licensing Department to discuss procedures for amending the license agreement to reflect the actual guest unit count.

2. The 4th architectural floor plan is not part of this design submittal. The plumbing drawings were used to determine the guest unit count and distribution for the 4th floor.

| A. ADA (AMERICANS WITH DISABILITIES ACT) | **New Construction:** ADA compliance is the responsibility of the owner of the development. The following evaluation is not intended to imply that correction of the noted deficiencies will result in full ADA compliance. IHG strongly recommends that an ADA evaluation of the design be performed by a qualified ADA specialist or legal authority to ensure full ADA compliance Refer to ADA federal Register and the Express Standards Manual for references to these requirements.<br><br>1. It is unclear whether or not ADA hearing impaired requirements have been met The architectural floor plans show revisions that appear to have removed the hearing impaired designation for the wheelchair accessible guest units. Only 5 hearing impaired guest units are confirmed by the architectural floor plans, none of which are HEXS suites. Be advised that per the requirements of the ADA, a minimum of 9 guest units (all 5 wheelchair accessible units + 4 additional) must be equipped for the hearing impaired. Additionally, hearing impaired units must be equally distributed among the various room types offered (including an HEXS type suite). All hearing/vision impaired equipment must be hard-wired. Have your architect review and revise the drawings as needed to ensure full ADA compliance for hearing and vision impaired requirements. There must be at least 9, equally distributed hearing impaired guest units at the time of opening of the hotel.<br><br>2. If you intend to use the newly created QQ wheelchair accessible suite (unit 213) as a means of meeting the equal distribution requirement to provide an accessible standard QQ unit, be advised that this suite must be made available |

01/05/2007  12:59    7706042476                    PIP DEPT                    PAGE  05/07

for rent in the reservations system as a standard, non-suite accessible QQ unit at non-suite, standard QQ prices in addition to being listed as an accessible HEXS suite unit. In short, if a guest requests an accessible QQ non-suite unit, you will be obligated to rent the accessible QQ suite at standard QQ prices. We do not recommend this solution for meeting equal distribution requirements as it may not meet the laws of the ADA for equal distribution and will have negative impact on revenue for this suite. It is strongly recommended that you consult with an ADA legal advisor about ADA compliance of the proposed solution.

| | |
|---|---|
| **B. LIFE SAFETY**<br>See Express Standards Manual chapter X | 1. Be advised that IHG does not approve 2nd floor design without the smoke barrier if indeed the 2nd floor corridor is open to the lobby space. A smoke barrier is an IHG Life Safety requirement that apparently exceeds local requirements. The more stringent requirement takes precedence. We will have to see revised drawings showing a smoke barrier design that is acceptable to IHG before IHG will consider approval to break ground. Please call me about this. |
| **C. LOBBY & GREAT ROOM**<br>See Express Standards Manual pages 78 - 84 | 1. In addition to the recessed down lights provided for the great room and lobby, decorative ceiling or pendant mounted fixtures are required. Refer to the Express prototype design for example of the caliber of lighting expected. What is your propose solution? |
| **D. VENDING/GUEST LAUNDRY**<br>See Express Standards Manual page 96 | 1. The electrical outlets for the vending machines on the 1st floor plan are in the wrong location. Relocate these outlets to be behind the vending machines as shown on the revised architectural floor plans. |
| **E. PUBLIC CORRIDORS**<br>See Express Standards Manual pages 92-93. | 1. Revise the design of your transition from lobby/great room areas to guest room corridors to meet the following standards: *Architectural elements (such as dropped headers, cased openings, decorative pilasters, etc.) that create natural transition points from Lobby/Great Room finishes to public corridors giving access to guest rooms must be provided. Transition of finishes must occur at a point beyond the primary public spaces.* What is your proposed solution?<br><br>2. Revise the design of your guest corridor ceilings to meet the following standards: *Ceiling designs must include changes in height and/or materials to visually interrupt the long, narrow character of corridors and highlight the guest room entryways. Acoustic tiles (2 x 2 tegular only) and gyp. board is minimum finishes allowed.* We will accept change in ceiling materials (gyp. |

01/05/2007  12:59    7706042476         PIP DEPT                          PAGE  06/07

board to tegular edge 2 x 2 acoustic tiles, for example) at the ceiling at every other stagger as the minimum acceptable solution.

| | |
|---|---|
| **F.** **DESIGN SUBMITTAL SCHEDULE** <br> Express Standards Manual pages 70-71 | It is the responsibility of the franchisee to arrange for submittal of one copy each of the following scheduled design proposals to IHG Design Review Department. The following is the full schedule of franchisee design submittal obligations for the duration of the project. As the design submittal process progresses, the schedule is edited to reflect remaining design proposals that are due. |

1. **Follow-up clarification/revised drawings:** Submit revised drawings as needed to show your proposed solutions to the conditions noted throughout today's design review. We do not need to see another complete set of construction drawings unless the overall hotel design changes from that reviewed today. Submit only those drawings needed to clarify or convey your proposed solutions. It is very important that you include a written response to each condition with your follow-up so as to expedite final approval of the hotel design/construction drawings. The smoke barrier issue must be resolved prior to ground break.

2. **Light Fixture Proposal:** Due prior to installation. A proposal consisting of specifications and physical appearance of all light fixtures proposed for the entire development (interior and exterior) must be submitted to IHG for review, and must be approved by IHG prior to installations.

3. **Interior Décor Proposals:** Due no later than ground break. Décor proposals must be professionally designed and presented to IHG for review. Proposals must include color boards, drawings and material samples showing the proposed décor scheme for the whole of the public areas and typical décor scheme for each guest room type. Décor proposals must also describe finishes and style of all hard goods, soft-goods, case goods, millwork, decorative moldings, interior finishes, lighting, artwork, fixtures and equipment that comprise the interior of a space. Décor proposals must be approved by IHG prior to execution.

4. **Fire Detection & Alarm Systems:** Due prior to installation. Shop drawings showing the complete design of the systems must be submitted to IHG for review and must be approved by IHG prior installations.

5. **Fire Suppression System:** Due prior to installation. Shop drawings showing the complete design of the system must be submitted to IHG for review and must be approved by IHG prior installations.

6. **Landscape Design Proposal:** Due prior to installation. Design drawings showing the complete landscaping design for the entire hotel development must be submitted to IHG for review and must be approved by IHG prior to planting.

7. **Design Clarification:** Submit movable wall partition(s) specifications for review prior to ordering or installation

8. **Design Clarification:** What interior design and equipment are planned for the convenience corner? Please clarify.

All submittals shall be sent to:

InterContinental Hotels Group
Attn: Design & Plan Review Department
Three Ravinia Drive, Suite 100
Atlanta, GA  30346-2149
Phone: 770-604-5118
Fax:  770-604-2476

All proposals shall be clearly identified with the following information:

- Name of hotel.
- City and state
- Location number or INNCODE
- Sender's name, address, phone and fax numbers; and email address.

All plans will be kept at the corporate office and retained for future reference. Décor submittals and specification books will be returned only when requested, and only when accompanied by a pre-addressed return label with one of the major US carriers.

Thank your for the design submittal. If you have any questions, please call me.

Sincerely,

*Kevin R. Woodard*

Kevin Woodard
Senior Design and Plan Review Consultant

*Phone:* 770/604-2413
*Fax:* 770/604-2476
*e-mail:* kevin.woodard@ichotelsgroup.com

# NOVA'S COPYRIGHT APPLICATION

## (See Affidavit ¶ 16)

Sep 28 2007 1:19PM     Vega Group          1-847-564-1473          p.1

Copyright Office fees are subject to change.
For current fees, check the Copyright Office      *Date 9-28-07*  No. of Pages **4**
website at *www.copyright.gov*, write the Copy-   To: *Ms Spathis*
right Office, or call (202) 707-3000.             *SHAH GUSSIS FISHMAN GLANTZ*
Company: /\
Fax #: *312-275-0564*
From: **Himanshu J. Modi**
         **Nova Design Build Inc.**
Fax # **(847) 564-1473**
Phone # **(847) 564-1058**

**Form VA**
For a Work of the Visual Arts
UNITED STATES COPYRIGHT OFFICE

REGISTRATION NUMBER

|   | VA | VAU |
|---|----|-----|

EFFECTIVE DATE OF REGISTRATION

Month        Day        Year

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**1**

Title of This Work ▼

**MOTEL PROJECT-1**

NATURE OF THIS WORK ▼ See Instructions

**ARCHITECTURAL DESIGN DRAWINGS**

Previous or Alternative Titles ▼   **N.A.**

Publication as a Contribution  If this work was published as a contribution to a periodical, serial, or collection, give information about the collective work in which the contribution appeared. Title of Collective Work ▼

If published in a periodical or serial give:  Volume ▼        Number ▼            Issue Date ▼            On Pages ▼

**2**

NAME OF AUTHOR ▼

a **HIMANSHU J. MODI**

DATES OF BIRTH AND DEATH
Year Born ▼  **11-4-1958**   Year Died ▼

**NOTE**

Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

Author's Nationality or Domicile
Name of Country
OR { Citizen of **U.S.A.**
      Domiciled in **U.S.A.**

Was This Author's Contribution to the Work
Anonymous?  ☐ Yes  ☒ No
Pseudonymous? ☐ Yes ☒ No
If the answer to either of these questions is "Yes," see detailed instructions.

Nature of Authorship  Check appropriate box(es). **See Instructions**
☐ 3-Dimensional sculpture        ☐ Map          ☐ Technical drawing
☐ 2-Dimensional artwork          ☐ Photograph   ☐ Text
☐ Reproduction of work of art    ☐ Jewelry design ☒ Architectural work

b  Name of Author ▼

Dates of Birth and Death
Year Born ▼        Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

Author's Nationality or Domicile
Name of Country
OR { Citizen of _____
      Domiciled in _____

Was This Author's Contribution to the Work
Anonymous?  ☐ Yes  ☐ No
Pseudonymous? ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

Nature of Authorship  Check appropriate box(es). **See Instructions**
☐ 3-Dimensional sculpture        ☐ Map          ☐ Technical drawing
☐ 2-Dimensional artwork          ☐ Photograph   ☐ Text
☐ Reproduction of work of art    ☐ Jewelry design ☐ Architectural work

**3**

a  Year in Which Creation of This Work Was
Completed **2006**
This information must be given Year in all cases.

b  Date and Nation of First Publication of This Particular Work
Complete this information ONLY if this work has been published.
Month **6**  Day **19**  Year **2006**
**U.S.A.**  Nation

**4**

COPYRIGHT CLAIMANT(S) Name and address must be given even if the claimant is the same as the author given in space 2. ▼

**HIMANSHU J. MODI**
**3036 PAWTUCKET ROAD, IL 60062**
**NORTHBROOK**

Transfer If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

APPLICATION RECEIVED

ONE DEPOSIT RECEIVED

TWO DEPOSITS RECEIVED

FUNDS RECEIVED

See instructions before completing this space.

DO NOT WRITE HERE OFFICE USE ONLY

**MORE ON BACK ▶**  • Complete all applicable spaces (numbers 5-9) on the reverse side of this page.
• See detailed instructions.  • Sign the form at line 8.

DO NOT WRITE HERE
Page 1 of _____ pages

| EXAMINED BY | | FORM VA |
| --- | --- | --- |
| CHECKED BY | | |
| ☐ CORRESPONDENCE<br>Yes | | FOR<br>COPYRIGHT<br>OFFICE<br>USE<br>ONLY |

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?

☐ Yes ☒ No  If your answer is "Yes," why is another registration being sought? (Check appropriate box.) ▼

a. ☐ This is the first published edition of a work previously registered in unpublished form.

b. ☐ This is the first application submitted by this author as copyright claimant.

c. ☐ This is a changed version of the work, as shown by space 6 on this application.

If your answer is "Yes," give: **Previous Registration Number** ▼          **Year of Registration** ▼

**5**

**DERIVATIVE WORK OR COMPILATION** Complete both space 6a and 6b for a derivative work; complete only 6b for a compilation.

a. Preexisting Material Identify any preexisting work or works that this work is based on or incorporates. ▼

FEW ELEMENTS COMPILED FROM FRANCHISE MOTEL
PROTOTYPE DESIGN. LAID OUT AND ARRANGED, MODIFIED
IN ORIGINAL (UNIQUE) WAY.

b. Material Added to This Work Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼

**6**

a

See instructions
before completing
this space.

b

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.
Name ▼                              Account Number ▼

**7**

a

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent. Name/Address/Apt/City/State/Zip ▼

HIMANSHU J. MODI
3036 PAWTUCKET ROAD
NORTHBROOK IL. 60062

b

Area code and daytime telephone number  (  (847)-564-1056        Fax number  (  (847) 564-1473

Email  hjmodi@gmail.com

**CERTIFICATION*** I, the undersigned, hereby certify that I am the

check only one ▶ {
☒ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☐ authorized agent of _____
Name of author or other copyright claimant, or owner of exclusive right(s) ▲

of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

**8**

Typed or printed name and date ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date.

HIMANSHU J. MODI                    Date  9-26-07

Handwritten signature (X) ▼

x  Himanshu J. Modi

**Certificate**
**will be**
**mailed in**
**window**
**envelope**
**to this**
**address:**

Name ▼  HIMANSHU J. MODI

Number/Street/Apt ▼  3036 PAWTUCKET ROAD

City/State/ZIP ▼  NORTHBROOK IL. 60062

**YOU MUST:**
• Complete all necessary spaces
• Sign your application in space 8
**SEND ALL 3 ELEMENTS**
**IN THE SAME PACKAGE:**
1. Application form
2. Nonrefundable filing fee in check or money order payable to Register of Copyrights
3. Deposit material
**MAIL TO:**
Library of Congress
Copyright Office
101 Independence Avenue SE
Washington, DC 20559-6000

**9**

*17 USC §506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

Form VA - Full  Rev 07/2006  Print 07/2006—30,000  Printed on recycled paper                    U.S. Government Printing Office: 2004-320-958/60,125



# Form VA

*Detach and read these instructions before completing this form.*
*Make sure all applicable spaces have been filled in before you return this form.*

## BASIC INFORMATION

**When to Use This Form:** Use Form VA for copyright registration of published or unpublished works of the visual arts. This category consists of "pictorial, graphic, or sculptural works," including two-dimensional and three-dimensional works of fine, graphic, and applied art, photographs, prints and art reproductions, maps, globes, charts, technical drawings, diagrams, and models.

**What Does Copyright Protect?** Copyright in a work of the visual arts protects those pictorial, graphic, or sculptural elements that, either alone or in combination, represent an "original work of authorship." The statute declares: "In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work."

**Works of Artistic Craftsmanship and Designs:** "Works of artistic craftsmanship" are registrable on Form VA, but the statute makes clear that protection extends to "their form" and not to "their mechanical or utilitarian aspects." The "design of a useful article" is considered copyrightable "only if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article."

**Labels and Advertisements:** Works prepared for use in connection with the sale or advertisement of goods and services are registrable if they contain "original work of authorship." Use Form VA if the copyrightable material in the work you are registering is mainly pictorial or graphic; use Form TX if it consists mainly of text. **Note:** Words and short phrases such as names, titles, and slogans cannot be protected by copyright, and the same is true of standard symbols, emblems, and other commonly used graphic designs that are in the public domain. When used commercially, material of that sort can sometimes be protected under state laws of unfair competition or under the federal trademark laws. For information about trademark registration, write to the U.S. Patent and Trademark Office, PO Box 1450, Alexandria, VA 22313-1450.

**Architectural Works:** Copyright protection extends to the design of buildings created for the use of human beings. Architectural works created on or after December 1, 1990, or that on December 1, 1990, were unconstructed and embodied only in unpublished plans or drawings are eligible. Request Circular 41, *Copyright Claims in Architectural Works,* for more information. Architectural works and technical drawings cannot be registered on the same application.

**Deposit to Accompany Application:** An application for copyright registration must be accompanied by a deposit consisting of copies representing the entire work for which registration is to be made.

**Unpublished Work:** Deposit one complete copy.

**Published Work:** Deposit two complete copies of the best edition.

**Work First Published Outside the United States:** Deposit one complete copy of the first foreign edition.

**Contribution to a Collective Work:** Deposit one complete copy of the best edition of the collective work.

**The Copyright Notice:** Before March 1, 1989, the use of copyright notice was mandatory on all published works, and any work first published before that date should have carried a notice. For works first published on and after March 1, 1989, use of the copyright notice is optional. For more information about copyright notice, see Circular 3, *Copyright Notice.*

**For Further Information:** To speak to a Copyright Office staff member, call (202) 707-3000 (TTY: (202) 707-6737). Recorded information is available 24 hours a day. Order forms and other publications from the address in space 9 or call the Forms and Publications Hotline at (202) 707-9100. Access and download circulars, forms, and other information from the Copyright Office website at *www.copyright.gov.*

## LINE-BY-LINE INSTRUCTIONS

*Please type or print using black ink. The form is used to produce the certificate.*

### 1  SPACE 1: Title

**Title of This Work:** Every work submitted for copyright registration must be given a title to identify that particular work. If the copies of the work bear a title (or an identifying phrase that could serve as a title), transcribe that wording *completely* and *exactly* on the application. Indexing of the registration and future identification of the work will depend on the information you give here. For an architectural work that has been constructed, add the date of construction after the title; if unconstructed at this time, add "not yet constructed."

**Publication as a Contribution:** If the work being registered is a contribution to a periodical, serial, or collection, give the title of the contribution in the "Title of This Work" space. Then, in the line headed "Publication as a Contribution," give information about the collective work in which the contribution appeared.

**Nature of This Work:** Briefly describe the general nature or character of the pictorial, graphic, or sculptural work being registered for copyright. Examples: "Oil Painting"; "Charcoal Drawing"; "Etching"; "Sculpture"; "Map"; "Photograph"; "Scale Model"; "Lithographic Print"; "Jewelry Design"; "Fabric Design."

**Previous or Alternative Titles:** Complete this space if there are any additional titles for the work under which someone searching for the registration might be likely to look, or under which a document pertaining to the work might be recorded.

### 2  SPACE 2: Author(s)

**General Instruction:** After reading these instructions, decide who are the "authors" of this work for copyright purposes. Then, unless the work is a "collective work," give the requested information about every "author" who contributed any appreciable amount of copyrightable matter to this version of the work. If you need further space, request Continuation Sheets. In the case of a collective work, such as a catalog of paintings or collection of cartoons by various authors, give information about the author of the collective work as a whole.

**Name of Author:** The fullest form of the author's name should be given. Unless the work was "made for hire," the individual who actually created the work is its "author." In the case of a work made for hire, the statute provides that "the employer or other person for whom the work was prepared is considered the author."

**What Is a "Work Made for Hire"?** A "work made for hire" is defined as: (1) "a work prepared by an employee within the scope of his or her employment"; or (2) "a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." If you have checked "Yes" to indicate that the work was "made for hire," you must give the full legal name of the employer (or other person for whom the work was prepared). You may also include the name of the employee along with the name of the employer (for example: "Elster Publishing Co., employer for hire of John Ferguson").

**"Anonymous" or "Pseudonymous" Work:** An author's contribution to a work is "anonymous" if that author is not identified on the copies or phonorecords of the work. An author's contribution to a work is "pseudonymous" if that author is identified on the copies or phonorecords under a fictitious name. If the work is "anonymous" you may: (1) leave the line blank; or (2) state "anonymous" on the line; or (3) reveal the author's identity. If the work is "pseudonymous" you may: (1) leave the line blank; or (2) give the pseudonym and identify it as such (for example: "Huntley Haverstock, pseudonym"); or (3) reveal the author's name, making clear which is the real name and which is the pseudonym (for example: "Henry Leek, whose pseudonym is Priam Farrel"). However, the citizenship or domicile of the author *must* be given in all cases.

**Dates of Birth and Death:** If the author is dead, the statute requires that the year of death be included in the application unless the work is anonymous or pseudonymous. The author's birth date is optional but is useful as a form of identification. Leave this space blank if the author's contribution was a "work made for hire."

**Author's Nationality or Domicile:** Give the country of which the author is a citizen or the country in which the author is domiciled. Nationality or domicile must be given in all cases.

**Nature of Authorship:** Categories of pictorial, graphic, and sculptural authorship are listed below. Check the box(es) that best describe(s) each author's contribution to the work.

**3-Dimensional sculptures:** fine art sculptures, toys, dolls, scale models, and sculptural designs applied to useful articles.

**2-Dimensional artwork:** watercolor and oil paintings; pen and ink drawings; go illustrations; greeting cards; collages; stencils; patterns; computer graphics; graphics appearing in screen displays; artwork appearing on posters, calendars, games, commercial prints and labels, and packaging, as well as 2-dimensional artwork applied to useful articles, and designs reproduced on textiles, lace, and other fabrics; on wallpaper, carpeting, floor tile, wrapping paper, and clothing.

**Reproductions of works of art:** reproductions of preexisting artwork made by, for example, lithography, photoengraving, or etching.

**Maps:** cartographic representations of an area, such as state and county maps, atlases, marine charts, relief maps, and globes.

**Photographs:** pictorial photographic prints and slides and holograms.

**Jewelry designs:** 3-dimensional designs applied to rings, pendants, earrings, necklaces, and the like.

**Technical drawings:** diagrams illustrating scientific or technical information in linear form, such as architectural blueprints or mechanical drawings.

**Text:** textual material that accompanies pictorial, graphic, or sculptural works, such as comic strips, greeting cards, games rules, commercial prints or labels, and maps.

**Architectural works:** designs of buildings, including the overall form as well as the arrangement and composition of spaces and elements of the design.

NOTE: Any registration for the underlying architectural plans must be applied for on a separate Form VA, checking the box "Technical drawing."

## SPACE 3: Creation and Publication

**General Instructions:** Do not confuse "creation" with "publication." Every application for copyright registration must state "the year in which creation of the work was completed." Give the date and nation of first publication only if the work has been published.

**Creation:** Under the statute, a work is "created" when it is fixed in a copy or phonorecord for the first time. Where a work has been prepared over a period of time, the part of the work existing in fixed form on a particular date constitutes the created work on that date. The date you give here should be the year in which the author completed the particular version for which registration is now being sought, even if other versions exist or if further changes or additions are planned.

**Publication:** The statute defines "publication" as "the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, by rental, lease, or lending"; a work is also "published" if there has been an offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display." Give the full date (month, day, year) when, and the country where, publication first occurred. If first publication took place simultaneously in the United States and other countries, it is sufficient to state "U.S.A."

## SPACE 4: Claimant(s)

**Name(s) and Address(es) of Copyright Claimant(s):** Give the name(s) and address(es) of the copyright claimant(s) in this work even if the claimant is the same as the author. Copyright in a work belongs initially to the author of the work (including, in the case of a work made for hire, the employer or other person for whom the work was prepared). The copyright claimant is either the author of the work or a person or organization to whom the copyright initially belonging to the author has been transferred.

**Transfer:** The statute provides that, if the copyright claimant is not the author, the application for registration must contain "a brief statement of how the claimant obtained ownership of the copyright." If any copyright claimant named in space 4 is not an author named in space 2, give a brief statement explaining how the claimant(s) obtained ownership of the copyright. Examples: "By written contract"; "Transfer of all rights by author"; "Assignment"; "By will." Do not attach transfer documents or other attachments or riders.

## SPACE 5: Previous Registration

**General Instructions:** The questions in space 5 are intended to find out whether an earlier registration has been made for this work and, if so, whether there is any basis for a new registration. As a rule, only one basic

copyright registration can be made for the same version of a particular work.

**Same Version:** If this version is substantially the same as the work covered by a previous registration, a second registration is not generally possible unless: (1) the work has been registered in unpublished form and a second registration is now being sought to cover this first published edition; or (2) someone other than the author is identified as a copyright claimant in the earlier registration, and the author is now seeking registration in his or her own name. If either of these two exceptions applies, check the appropriate box and give the earlier registration number and date. Otherwise, do not submit Form VA; instead, write the Copyright Office for information about supplementary registration or recordation of transfers of copyright ownership.

**Changed Version:** If the work has been changed and you are now seeking registration to cover the additions or revisions, check the last box in space 5, give the earlier registration number and date, and complete both parts of space 6 in accordance with the instruction below.

**Previous Registration Number and Date:** If more than one previous registration has been made for the work, give the number and date of the latest registration.

## SPACE 6: Derivative Work or Compilation

**General Instructions:** Complete space 6 if this work is a "changed version," "compilation," or "derivative work," and if it incorporates one or more earlier works that have already been published or registered for copyright, or that have fallen into the public domain. A "compilation" is defined as "a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship." A "derivative work" is "a work based on one or more preexisting works." Examples of derivative works include reproductions of works of art, sculptures based on drawings, lithographs based on paintings, maps based on previously published sources, or "any other form in which a work may be recast, transformed, or adapted." Derivative works also include works "consisting of editorial revisions, annotations, or other modifications" if these changes, as a whole, represent an original work of authorship.

**Preexisting Material (space 6a):** Complete this space *and* space 6b for derivative works. In this space identify the preexisting work that has been recast, transformed, or adapted. Examples of preexisting material might be: "Grunewald Altarpiece" or "19th century quilt design." Do not complete this space for compilations.

**Material Added to This Work (space 6b):** Give a brief, general statement of the *additional* new material covered by the copyright claim for which registration is sought. In the case of a derivative work, identify this new material. Examples: "Adaptation of design and additional artistic work"; "Reproduction of painting by photolithography"; "Additional cartographic material"; "Compilation of photographs." If the work is a compilation, give a brief, general statement describing both the material that has been compiled *and* the compilation itself. Example: "Compilation of 19th century political cartoons."



## SPACE 7, 8, 9: Fee, Correspondence, Certification, Return Address

**Deposit Account:** If you maintain a Deposit Account in the Copyright Office, identify it in space 7a. Otherwise, leave the space blank and send the fee with your application and deposit.

**Correspondence (space 7b):** Give the name, address, area code, telephone number, email address, and fax number (if available) of the person to be consulted if correspondence about this application becomes necessary.

**Certification (space 8):** The application cannot be accepted unless it bears the date and the *handwritten signature* of the author or other copyright claimant, or of the owner of exclusive right(s), or of the duly authorized agent of the author, claimant, or owner of exclusive right(s).

**Address for Return of Certificate (space 9):** The address box must be completed legibly since the certificate will be returned in a window envelope.

**PRIVACY ACT ADVISORY STATEMENT Required by the Privacy Act of 1974 (P.L. 93 - 579)**
The authority for requesting this information is title 17, U.S.C., secs. 409 and 410 Furnishing the requested information is voluntary. But if the information is not furnished, it may be necessary to delay or refuse registration and you may not be entitled to certain relief, remedies, and benefits provided in chapters 4 and 5 of title 17, U.S.C.
The principal uses of the requested information are the establishment and maintenance of a public record and the examination of the application for compliance with the registration requirements of the copyright code.
Other routine uses include public inspection and copying, preparation of public indexes, preparation of public catalogs of copyright registrations, and preparation of search reports upon request.
NOTE: No other advisory statement will be given in connection with this application. Please keep this statement and refer to it if we communicate with you regarding this application.

# CITY OF WAUKEGAN'S
# 7/29/08 LETTER TO NOVA

# (See Affidavit ¶ 19)



**City of**
# Waukegan
100 N. Martin Luther King Jr. Avenue
Waukegan, Illinois  60085
www.waukeganweb.net
✆(847)  599-2500

**Richard H. Hyde, Mayor**
**Wayne Motley, City Clerk**
**Patrick M. Dutcher, Treasurer**

July 29, 2008

Mr. Himanshu Modi
Nova Design Building, Inc.
3100 Dundee Road, Suite 508
Northbrook, Illinois 60062

RE:    611 Lakehurst Road - **Final Inspection Results – Not Approved**

Dear Mr. Modi:

**The results of the final inspection conducted on July 28, 2008 are as follows per LN:**

1)    The property is not ready for final inspection.

**After correcting the above items <u>you must call</u> the Building Permitting Department to schedule another Engineering inspection.**

Respectfully,

Likowo Ndobedi,
Engineering Inspector

CC:    Edna Nieves, Permit Administrator, Building Permitting Department
       Mukesh Bheda, Grace Hotels, LLC

LN:kml

M:\WordDocs\Site Plans Reviews\2008\Inspection Results\Lakehurst Rd. 611 - Final Inspection - Not Approved.docx

Printed on Recycled Paper